## THE JOHN CARROLL.

### Appeal of MULLIGAN.

(Circuit Court of Appeals, Second Circuit.   July 11, 1921.)

No. 241.

1. **Wharves ⬯20(1)—Wharf manager held negligent in permitting scow to remain at end of pier with knowledge of approaching storm.**

   Wharf manager, who shifted a scow from a place of safety between piers to the end of the pier, and who permitted it to remain there for hours after due warning of the approach of a storm, *held* negligent, and therefore liable for damages to scow sustained in the storm by pounding against the pier during the storm.

2. **Negligence ⬯4—Care must be in proportion to danger.**

   The care to be exercised must be in proportion to the danger to be avoided.

3. **Shipping ⬯54—Charterer secondarily liable for damage to boat by reason of manager's negligence.**

   A charterer, who was bound to return boat to owner in as good condition as when it took possession, reasonable wear and tear excepted, was secondarily liable for damages from injuries from the negligence of a wharf owner, unless it could overcome presumption of negligence created by return of scow in damaged state by showing that the loss occurred through some cause consistent with due care on its part. .

4. **Bailment ⬯31(1)—Bailee presumed to have been negligent on return of property in a damaged condition.**

   Where chattels are delivered to a bailee in good condition and are returned in a damaged condition, bailee will be presumed to have been negligent, and has the burden of proving that the loss was due to causes consistent with due care on his part.

5. **Shipping ⬯58(2)—Evidence held insufficient to overcome presumption of negligence of charterer.**

   In action for damages to a scow sustained in a storm after wharf manager had shifted the scow from a place of safety between piers to a place of danger at the end of a pier, and had negligently permitted it to remain at pier end notwithstanding warning of approaching storm, evidence *held* insufficient to overcome presumption, arising by reason of the return of scow in a damaged state, that charterer was also negligent, and therefore secondarily liable.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by John G. Mulligan, as executor of the estate of Lawrence Mulligan, deceased, against the steam tug John Carroll, Carroll Towing Line, Inc., claimant, and others.   Decree for defendants, and libelant appeals.   Reversed, with directions.

Macklin, Brown & Purdy, of New York City (Pierre M. Brown, of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (Leonard J. Matteson, of New York City, and R. F. Shaw, of Syracuse, N. Y., of counsel), for respondent-appellee New York Central Railroad Company.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. de Grove Potter, of New York City, of counsel), for appellee United Port Service Company.

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is a suit in admiralty to recover damages to the scow A. A. Donohue, hereinafter called the scow. At the time of the damage alleged the scow was in the possession of the New York Central Railroad Company, a corporation existing under the laws of the state of New York, and a resident of the southern district thereof. The scow was at the times mentioned herein and still is the property of the estate of Lawrence Mulligan, and the libelant sues as the executor of that estate. The railroad company was in possession of the scow under a verbal charter, which is alleged to have been a demise, and under which the railroad company was bound to return the boat in as good condition as when it was received.

On November 18, 1915, the scow was lying alongside of a steamer between piers Nos. 3 and 4, American Docks, Staten Island. At about 10 a. m. on the morning of the day named, the steam tug John Carroll, employed by the United Port Service Company as its agent, came alongside of the scow and announced its intention of moving it to the end of pier No. 3. The libel alleged that the master of the scow protested against being placed at the end of the pier, upon the ground that it was an unsafe thing to do. The master testified that he did so protest, but in this respect he was contradicted by other witnesses. At any rate the shift was made, and the scow was left at the end of the pier during the rest of that day. Shortly after the shift was made a barge was placed outside of the scow, and during the night a second barge was placed outside of her. About 2 a. m. on the morning of November 19th a heavy wind came up, and caused the scow to pound heavily against the pier. Additional lines were gotten out, but the wind increased in violence, and about 9 a. m. the tug John Carroll took the two barges away, but allowed the scow to remain at the end of the pier.

The master testified that at that time two tugs belonging to the railroad company were in the slip between piers No. 2 and No. 3, and that he requested them to render assistance, but that they declined to do so. The master testified that he also requested, without result, assistance from the pier superintendent. At about 11 a. m. a tug belonging to the railroad company took the scow and placed her in the slip between piers No. 2 and No. 3.

But during the time the scow was left at the pier end she received damages because of her pounding against the pier, due to her exposed condition .

The libelant claims that the damage was caused by the negligence of the tug John Carroll in the following respects:

(1) In negligently moving the scow from a place of safety between the piers to a place of danger at the end of pier No. 3.

(2) In failing to remove the scow from her position of danger after her dangerous condition, due to the increased wind, became apparent.

The libelant also claims that the damage was caused by the negligence of the railroad company in the following respects:

(1) In not providing a safe place for the scow to lay.

(2) In instructing its agents to move the scow to the end of pier No. 3.

(3) In failing to remove the scow when her dangerous position became apparent.

The Carroll Towing Line, Inc., claimant, as the owner of the steam tug John Carroll, filed a petition against Messrs. Norton, Lilly & Co., and the United Port Service Company, and alleged that the tug John Carroll was under charter to them at the times in question, and that the scow was placed at the end of pier No. 3 under the instructions of their servants, for which they were liable. Norton, Lilly & Co. did not appear, and were not before the court. The United Port Service Company filed an answer, in which it admitted that pursuant to its instructions the tug John Carroll shifted the scow from alongside of pier 3, where the boat was berthed to the end of the pier. It admitted that the two barges moored alongside of the scow were moved "as soon as possible, and every effort was made to remove the scow, * * * but owing to the heavy sea, the scow * * * could not be moved until about 11 a. m. on the morning of the 19th." It was further alleged "that if any damage occurred to the scow * * * it was caused wholly by and was due solely to an act of God, and was not caused nor contributed to in any manner whatsoever by this respondent, its agents, servants, or any one for whom it may have been responsible."

The court below held that the damage was caused by the negligence of the scow master, and he was the servant of the libelant, and that the libelant, accordingly, was not entitled to any recovery. The libel was dismissed against the United Port Service Company "on the ground that it is not negligent to shift the barge to the pier ends under the circumstances and when they did; and I have also held that there was no affirmative duty on them to shift her on the morning of the 19th, or at least that they were not shown to have neglected the performance of such a duty."

The United Port Service Company called several witnesses. Their testimony shows that pier No. 3 was leased to that company at the time involved herein. That that company for its own convenience instructed the tug John Carroll to shift the scow to the end of the pier, and in pursuance of its instructions the scow was so shifted in the afternoon of November 16th, and was allowed to remain there until Friday forenoon November 19th, when between 9:25 a. m. and 10:30 a. m. she was shifted around to the north side of the pier; that the end of the pier was an unsafe place for the scow during the storm; that the tug which finally shifted the scow from the end of the pier was obliged to "knock off" after it made the shift because of the very heavy sea, which rendered it impossible for her to work any longer. The receiving clerk in charge of the pier admitted that—

Around 9 o'clock the captain of the scow met him, and "we came into the office together, and I called up the New York Central and also his owners. The New York Central said they had a couple of towboats there, and would do what they could to shift the barge from the end of the dock. I know that the New York Central had a couple of towboats around the end of the pier in the morning, and he hailed them, and they wouldn't touch them."

Then later on he testified:

"Q. On the morning of the nineteenth, did you call up the New York Central? A. I wouldn't like to swear to it. I usually do in a case of this kind. * * *

"Q. Did you call to any passing tugs? A. Yes, I was on the end of the pier myself, with the captain, between the hours of 8 and 10, when he was shifted, and we hailed a couple of New York Central tows, but they wouldn't come.

"Q. New York Central tows? A. Tugboats. They were lying around there. * * *

"Q. Now that morning at 9 o'clock or before that the captain came to you? A. Between the hours of 8 and 9.

"Q. What did he say to you? A. The exact words I can't say. The barge was there, but she was in a dangerous position. I said, 'What do you want?' He said, 'Call up the people.' I think we called his people and also the New York Central. The New York Central says, 'We have a couple of tugboats out shifting boats, and we'll take care of it.' I went out with the captain.

"Q. He told you they were New York Central tugs? A. No. The answer I got from the railroad was that they had some towboats down there, and they would take care of them. * * *

"Q. What did you do then? Go down and ask them to assist the Donohue? A. I was on the end, and asked them to come in and take the Donohue out.

"Q. Did they do it? A. No.

"Q. They refused to do that? A. Yes.

"The Court: It was blowing very hard, and when you spoke to them you had to speak into the wind?

"The Witness: Yes, and the water was striking over me at the same time.

"The Court: And they could not hear you?

"Witness: No."

The storm was one of unusual violence. The testimony of the head of the weather bureau in New York shows that the wind began to blow from the east about 5 p. m. on the 18th, and that it steadily increased during the night, and that between 10 and 11 of the next morning it had reached a maximum of 71 miles. That after 7 a. m. of the 18th there were indications of its approach, and that at 4 p. m. on the afternoon of the 18th the Bureau sent out warnings of a northeast storm, and that it would be attended by easterly gales off the Middle Atlantic and Southern New England coasts by early Friday morning. The storm signals were displayed at the top of the Whitehall Building, and at Sandy Hook and Long Branch. The information was given by telephone to the towing and to the railroad companies as the Bureau obtained it.

The District Judge dismissed the United Port Service Company from the case, stating that he did so on the ground that it was not negligent to shift the scow to the end of the pier at the time the shift was made. In this there was no error. But in holding that there was no affirmative duty on that company to shift the scow on the morning of the 19th, "or at least that they were not shown to have neglected the performance of such a duty," he fell into error.

[1, 2] The United Port Service Company as wharf manager owed a duty to the scow. It employed a harbor master who had authority to shift the barges in and around the pier. Under his orders the scow was moored to the south side of the pier on November 14th, and under his orders she was shifted on November 16th to the end of the pier, where she was when the storm broke on November 18th, and where she was

275 F.—20

permitted to remain for hours after due warning of the storm had been given. In placing the scow at the end of the pier and in allowing her to remain there the United Port Service Company took the responsibility therefor, and assumed the obligation of her protection. The law imposed upon it, as it had the right to determine at what part of the pier the vessel was to be moored, the duty to exercise reasonable care for her protection. The care to be exercised must be in proportion to the danger to be avoided. And it is a general rule that a person engaging in an act which the circumstances indicate may be dangerous must take such care as prudence suggests to avoid injury. The testimony shows conclusively that the end of the pier was a safe place at which to moor the scow only so long as the weather continued moderate, and the pier end was regarded by all the witnesses who testified upon the subject as an unsafe place when a strong easterly wind was blowing. The officials in control of the wharf knew, or ought to have known, for hours before the scow was shifted that the end of the pier at which they had moored her was an unsafe place for her to remain. The wind had been blowing from the east since 5 o'clock Thursday afternoon, and an east wind was dangerous. The storm warnings had been sent out as early as 4 o'clock of that same afternoon of Thursday, and the information was at the same time given that a storm from the east accompanied by gales was expected early on Friday morning. But notwithstanding this the scow was left at the pier's end until 11 o'clock of Friday forenoon, and the task of moving her was not completed until 11:30. This, we think, was a failure on the part of the United Port Service Company, which had ordered the scow placed at the end of the pier, and which controlled the mooring of vessels at the pier, to exercise reasonable care for the protection of the boat by causing its removal from what had become a place of danger to a place of safety. For its failure to perform that duty it should answer in damages. The primary responsibility rested upon it.

[3] The New York Central Railroad Company was the charterer of the scow, and it seems to be conceded that the boat was in a seaworthy condition when the railroad company took possession of it. It was bound to return the scow to the libelant in as good condition as she was in when it took possession—reasonable wear and tear excepted. It did not do so, and is therefore secondarily liable in accordance with our decision in Healey v. Moran Towing & Transportation Co., 253 Fed. 334, 165 C. C. A. 116.

[4, 5] It is a general rule of the law of bailments that where chattels are delivered to a bailee in good condition and are returned in a damaged state the law presumes negligence to be the cause, and casts upon the bailee the burden of showing that the loss is due to other causes consistent with due care on his part. 6 C. J. p. 1158. While the bailee may overcome this presumption by showing that the loss occurred through some cause consistent with due care on his part, that presumption, under the circumstances of this case, was not overcome. The New York Central Railroad Company operates night tugs and day tugs with no cessation. It is true that the master of New York Central Tug No. 25 was instructed to go down to the American Docks to look

after the New York Central boats that were there. He was not informed that this scow was one of such boats, and he did not know that she was, and he did not arrive at the docks until 10:15 on Friday morning. He then shifted the barge Rochester, which he found lying at the end of Pier 1. Then he shifted the Buffalo, which was lying at the end of Pier 2. And at 11 o'clock he began shifting the scow Donohue. The following explains how he came to shift her:

"Q. Why did you take her? A. I was asked by a man who represented the New York Central Railroad to shift the boat.
"Q. What did the man say to you? A. He asked me would I shove the Donohue off Pier 3.
"Q. Did you know the man? A. I didn't know at the time.
"Q. Did you find out afterwards? A. He told me he represented the New York Central Railroad.
"Q. Did you shift the boat? A. Yes, sir.
"Q. What time did you begin her shifting? A. Eleven o'clock.
"Q. What time did you finish? A. At 11:30."

But as the advance notice of the approaching storm had been sent out on Thursday afternoon, the assistance rendered at 11 o'clock on Friday morning came too late to prevent the resulting injury, and was, in our opinion, so dilatory and negligent as not to relieve it of its secondary liability.

The District Judge thought that if there was negligence it was the negligence of the master of the scow, and that his negligence was attributable to the libelant, as he was the libelant's servant. We do not consider it necessary in this case to decide whether the negligence of the master of the scow is the negligence of its owner, but we do not agree that the facts clearly show negligence on his part. His testimony was that he went to the office of the United Port Service Company as soon as that office was opened Friday morning, and asked to have the boat removed from the end of the pier. In this he is not contradicted.

The decree is reversed, and the court below is directed to reinstate the libel and enter a decree in favor of the libelant against the United Port Service Company, with a right in the libelant to recover from the New York Central Railroad Company should he be unable to collect the amount of the decree from the United Port Service Company.