CENTRAL BARGE CO.

v.

CITY OF MINNEAPOLIS.

Civ. No. 4023.

United States District Court
D. Minnesota, Fourth Division.
June 28, 1954.

Clyde F. Anderson, O. C. Adamson II (Meagher, Geer, Markham & Anderson), Minneapolis, Minn., for libelant.

John F. Bonner, City Atty., D. J. Shama, Asst. City Atty., Carsten L. Jacobson, Asst. City Atty., Minneapolis, Minn., for respondent.

NORDBYE, Chief Judge.

The above cause came before the Court for trial without a jury.

This is a proceeding in admiralty and arises out of the breaking away of a

barge owned by the libelant from respondent's wharf on the Mississippi River at Minneapolis. Respondent is a municipality and charges a fee for its services in the unloading and the storage of the cargoes delivered at the wharf. The wharf is concrete and from above its outline forms a trapezoid with its base and two sides—extending north and south—along the shore line of the river. These walls are used for the mooring of vessels. Vessels docking at the wharf are moored to castiron kevels about three feet in length which look somewhat like an anvil and are anchored by six one-inch bolts set eighteen inches into the concrete and bent on the bottom. There are also a few bollard-type kevels, which are eight-inch pipes set in and filled with concrete and through the tops of which pass cross arms.

Libelant is a private carrier and owner of the barge called the "C.B. 208" which carried a cargo of coal to the Minneapolis wharf on Friday, the 6th of April, 1951. The barge was delivered to the wharf by Captain Moll, an employee of the libelant, at about midnight when no one was at work on the wharf. The men on his tug tied up the C.B. 208 on the southern end of the center wall of the wharf, using two two-inch manila lines—one running from the bow timberhead and another from a stern timberhead—both tied to horned kevels on the wharf so that about one foot remained between the barge and the wharf. The closest kevels on the wharf were chosen, so that the ropes when tied formed right angles with the wharf and the barge. At this time there were no abnormal conditions in the river.

The employees of the City first discovered the barge when they reported to work on the morning of Monday, April 9th. They did not work on Saturday or Sunday, April 7th and 8th. They added to the ropes affixed by the tug, two ⅝ inch, six by nineteen steel cables which ran from the timberheads, around the kevel on the wharf and back to the timberheads on the barge. In addition, they added a 2¾ inch manila rope at the center of the barge running to a kevel about six feet south of the point of fixture on the barge. Some time that morning, Torman, the City harbor master, was warned by Cutter, a local agent of the libelant, that the river looked angry and that the barge should be made snug. And about 1:25 P.M., on April 9th, Torman was notified by the Northern States Power Company that its dam at Coon Rapids would be opened to let ice and water come through. Although Torman relayed this information to the dock workers, they regarded the moorings they had already added as sufficient and therefore took no further action with respect to the barge.

The C.B. 208 broke away from its moorings at about 3:15 on the afternoon of the 9th. By that time the river had become filled with ice to the extent that it appeared to be almost a solid mass from shore to shore. The kevel around which the bow lines were tied sheared off first, the bow swinging out with the current and causing the manila rope from the center of the barge to break. The weight of the barge and the force of the current next wrenched the stern kevel off the wharf, twisting and pulling the anchoring bolts from the concrete. The barge floated downstream until it came to rest on U.S. Dam and Lock No. 1. This action was instituted to recover for loss to the barge and its cargo, but pursuant to pre-trial order, libelant seeks at present only an interlocutory decree of liability.

The libelant relies on two claims, the first predicated upon negligence and the second upon the theory of bailment. The libel alleges eighteen grounds of negligence which can be summarized as charging first, that the respondent failed to exercise due care to provide a safe berth for vessels docking at its wharf; second, that it unreasonably failed to take steps to protect the barge after notice of the impending danger, and finally, that it negligently failed to retrieve the C.B. 208 after the said barge broke adrift. The bailment claim is substantially a reallegation of the several

grounds of negligence alleged under the first claim.

■ There is no dispute between the parties as to the existence of a duty upon the part of the respondent wharfinger to exercise care to provide a safe berth. Nor is there any real controversy over the standard of care owed. It is well settled that a wharfinger does not guarantee the safety of vessels coming to his wharves, but he owes a duty to use ordinary care and diligence to furnish a safe berth or to discover the existence of dangerous conditions and to give notice thereof to vessels about to use the wharf. Smith v. Burnett, 1899, 173 U. S. 430, 19 S.Ct. 442, 43 L.Ed. 756; Norfolk Tidewater Terminals, Inc. v. Wood Towing Corp., 4 Cir., 1938, 94 F.2d 164; Morey v. City of New Rochelle, 2 Cir., 1918, 254 F. 425; Tracy Towing Line, Inc. v. City of Jersey City, D.C.N.J. 1952, 105 F.Supp. 910. And the standard of care is no different although the claim rests upon bailment. Clark v. United States, 1877, 95 U.S. 539, 24 L. Ed. 518. The libelant contends, however, that since the respondent wharfinger was a bailee, the burden of proof on the issue of reasonable care rests upon the respondent. The evidence here is perhaps sufficient to sustain the finding of a bailment. The City's control over the barge was unconditional. It could use any means available to move the barge whither and when it chose without asking leave of the barge company. Some courts have held that under these circumstances the burden of proof shifts to the bailee to show that he exercised due care toward the bailed property. Lake Union Dry Dock & Machine Works v. United States, 9 Cir., 1935, 79 F.2d 802; The John Carroll, 2 Cir., 1921, 275 F. 302. And see C. F. Harms Co. v. Erie R. Co., 2 Cir., 1948, 167 F.2d 562; Newport News Shipbuilding & Dry Dock Co. v. United States, 4 Cir., 34 F.2d 100, 103–105, certiorari denied, 1929, 280 U.S. 599, 50 S.Ct. 69, 74 L.Ed. 645; The Dupont, D.C.Md.1936, 14 F.Supp. 193; Berwind-White Coal Mining Co. v. Central Coal Co., D.C.S.D.N.Y.1948, 81 F. Supp. 655.

■ However, the correct view seems to be that proof of damage to bailed property while it is in the bailee's hands does not shift the burden of proof to the bailee, but merely a burden of going forward with the evidence. In Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89, suit was brought in admiralty against a bargee by the owner of cargo lost when the barge had sunk. The issue was whether the barge had sunk because of unseaworthiness, and the question before the Court was which party had the burden of proof on that issue. The Court held that, although the respondent was a bailee, yet the burden of proof was on the bailor and did not shift in the course of the trial. As necessary support for its decision, the Court likened the situation to litigation between any other bailee and bailor on the issue of negligence. It held that the burden of proof rests upon him who asserts breach of a duty and that that burden does not shift during the trial. It observed that in determining whether that burden has been satisfied, the law takes into account the relative opportunity of the parties to know the facts, and therefore in the case of bailees, commands that they come forward with information explanatory of the loss or suffer the trier of fact to draw an inference against them. It pointed out at 314 U.S. at page 111, 62. S.Ct. at page 161 that:

"Whether we label this permissible inference with the equivocal term 'presumption' or consider merely that it is a rational inference from the facts proven, it does no more than require the bailee, if he would avoid the inference, to go forward with evidence sufficient to persuade that the non-existence of the fact, which would otherwise be inferred, is as probable as its existence. It does not cause the burden of proof to shift, and if the bailee does go for—

ward with evidence enough to raise doubts as to the validity of the inference, which the trier of fact is unable to resolve, the bailor does not sustain the burden of persuasion which upon the whole evidence remains upon him, where it rested at the start."

It has been suggested that the inference or presumption raised by the failure to return bailed property in good condition is one which necessarily disappears whenever the bailee offers evidence as to the circumstances under which the loss occurred. Delaware Dredging Co. v. Graham, D.C.E.D.Pa.1930, 43 F.2d 852. The language of the Supreme Court would indicate, however, that the inference, if drawn, is one to be weighed against the evidence of the improbability of the inferred fact. In any event, it seems clear that the inference is not mandatory, but is one that the trier of fact is free to draw in light of all the circumstances. In the case at bar, the evidence details the circumstances of the break-away. It appears that the immediate cause of the failure of the kevels was a tremendous and unprecedented amount of ice converging upon the barge. In the absence of more specific evidence that the City's attempts to protect the barge were negligent in light of the danger, it seems as likely that the break-away was unavoidable as it does that it was the result of negligence. A finding, therefore, that the City has breached any duty to use due care to provide a safe berth must depend upon the specific evidence introduced at the trial.

■ The libel herein asserts, in substance, that the City negligently failed to provide sufficient watchmen to care for the barge placed in its control. As to this allegation, the evidence clearly shows that a lack of watchmen was not a contributing factor in this break-away. Although there was no one on duty on the wharf when the barge was delivered, it did not escape until the afternoon of the 9th of April when the wharf was fully staffed. At this time no added personnel would have aided the situation, for those on duty discovered the barge early that morning and did what they thought sufficient to moor it safely.

■ Libelant's allegations as to the City's negligence in failure to inspect the wharf and the kevels in use there is similarly without merit since it has offered no evidence that the kevels were in a deteriorated condition and since respondent has affirmatively shown that the kevel bolts were examined after the accident and found to be free of deterioration, rust or corrosion. Therefore, the City's alleged failure to inspect could not have contributed to the failure of the kevels.

■ Evidence was introduced to the effect that the respondent was negligent in the maintenance of its wharf in that it failed to have ice-breakers constructed north of the dock so as to deflect the moving ice away from the dock and thus eliminate the danger of mass pressure on the moored barges. Captain Moll, witness for the libelant, who tied up the C.B. 208 in the first place, testified that wherever there is swift water and a considerable amount of ice, docks are furnished with such ice-breakers. There appears, however, to be only one place on the Mississippi which does maintain ice-breakers. Moreover, the river had never in the memory of the witnesses presented a danger as extreme as was presented by the quantities of the ice in the river on the day of the accident. Further, the establishment of a structure such as the libelant suggests could not have been accomplished without obtaining the affirmative consent of Congress. See 30 Stat. 1151 (1899), 33 U.S.C.A. § 403. And finally, the risk, if there was one, presented by the absence of ice-breakers in the river was one that was as apparent to the libelant as it was to the City. After delivering the C.B. 208 to the wharf in the face of the conditions as they existed, it cannot be heard to complain of the danger thereby presented.

■ Much testimony was given by an expert for libelant that the cleat-type kevels which the City provided for mooring along the center wall of its wharf were of inferior quality. The thrust of

this testimony was to the effect that another type of kevel, the bollard post, could withstand a greater strain. However, it appears from the evidence that this type of kevel used on respondent's wharf was used in at least three other wharves of comparable size. In addition, testimony was introduced by the City that the bollard post was subject to greater deterioration and was harder to inspect than the kevel selected for this wharf. But whether or not the bollard is a superior mooring device, the fact that the cleat-type were in relatively common use and had never since their installation shown signs of breaking because of pressure from the river compels the conclusion that the maintenance of the kevels was not in itself a breach of the City's obligation to use due care.

■ A more difficult issue is presented by the libelant's contention that the City was negligent in failing to take affirmative steps to safeguard the C.B. 208 after receiving notice that ice and high water were coming down river. This contention is supported by the fact that the City was timely informed of the ice floe which in all probability would assemble in this part of the river, and it also was specifically warned that the impending conditions and circumstances required extra caution to moor the barge safely. The City knew that the owners of the barge could do nothing more than warn it of the force and the danger in the river. The tug which had brought the barge to the wharf had gone down the river some two days before. No other facilities for securing the safety of the barge were available to libelant. Under such circumstances, it is not unreasonable to impose upon the wharfinger, who had the last opportunity to protect the moored vessel, the duty to take precautions reasonable in light of the on-coming peril. C. F. Harms Co. v. Erie R. Co., 2 Cir., 1948, 167 F.2d 562; The Everett Fowler, 2 Cir., 1945, 151 F.2d 662, certiorari denied sub. nom. United States v. Petterson Lighterage & Towing Corp., 1946, 327 U.S. 804, 66 S.Ct. 963, 90 L.Ed. 1029.

■ No negligence, however, can be predicated upon the City's failure to move the C.B. 208 around to the south wall of the wharf. Barges moored at the wharf can only be moved with the aid of tugs or by power cranes. And the City has shown that the tug owned by the most accessible tug operator was not available on the day in question. Although there is some evidence that there is one tug in St. Paul which at times was called upon by the respondent to move barges at its wharf and that a boat belonging to the Coast Guard was also in that City, this Court can only speculate whether help could have been obtained at the time in question from either of these sources. In addition, although it has been shown that it would have been physically possible for the City to have moved the barge with the power winches on its cranes, it is highly conjectural whether under the circumstances it would not have been more hazardous to attempt this than to leave the barge where it was.

■ However, the libelant herein also contends that the City was negligent in the manner in which it attempted to secure the C.B. 208. The evidence clearly establishes that had lines been run from the barge to kevels upriver rather than to the kevels closest at hand so as to form acute angles with the wharf rather than right angles, they would have provided a more effective resistance to force applied to the bow. An expert for libelant testified that if the City's dock workers merely had run single lines from the same points on the barge to the kevels next in line upriver, instead of doubling the cables around the kevels immediately opposite the points of fixture on the barge, the moorings would have been able to withstand approximately six times as much force exerted on the bow as was necessary to break the kevels with the lines attached as they were. Moreover, his testimony and the testimony of others showed that it is not considered good seamanship under such conditions to moor a vessel with lines at right angles. Even respondent's witnesses admit that it was

poor seamanship to fasten the additional lines to the kevels already in use and to fail to run a spring line from the bow upstream. Respondent contends that this testimony is of no moment because libelant has not produced evidence to show what amount of force was exerted by the combination of ice and water, and therefore has not shown that a better mooring practice would have prevented the breakaway under the extreme river conditions. However, the negligence asserted on behalf of libelant is not failure to predict the extent of this particular phenomenon. Its argument and its evidence show that it is not good seamanship under the adverse river conditions to leave a vessel moored in the manner that the C.B. 208 was moored. It is clear that the reason why such mooring is negligent is that the vessel is liable to be unable to withstand forces in the river exerted upon its bow. Certainly, the improper moorings had a direct causal connection with the breakaway. Therefore, even if the force of the ice on this particular occasion was so great that a more carefully moored vessel might have broken away, it cannot be said that the proximate cause of the break-away was not the improper moorings when the intervening force of the ice merely accelerated the very danger which was created by the City's negligence. Even if this were not the case, however, the heavy burden of proof would be on the respondent to establish the contention that the accident was unavoidable. Swenson v. The Argonaut, 3 Cir., 1953, 204 F.2d 636. It would therefore be the obligation of the City to show that the force in the river would have been irresistible even after a proper display of nautical skill. This it has failed to do.

Under all the circumstances, therefore, it seems reasonable to conclude that the employees of the respondent failed to take the precautions which were reasonable, in view of the known danger, to moor this barge safely. The Court recognizes that the dock workers of the City are not supposed to be equipped with the nautical or engineering skill of libelant's expert, for instance, who testified to the shearing strength of the kevels with lines fastened to them at certain angles. But they are chargeable with the duty to exercise the fundamentals of good seamanship in view of the known circumstances. As heretofore stated, all witnesses conceded that it was poor seamanship to moor the vessel in an angry river with mooring lines at right angles, and that it was negligence for the dock workers to attempt to secure the barge in this manner, in view of the known danger, seems impelling. Moreover, the mere fact that Captain Moll left the vessel with mooring lines at right angles in a normal river does not relieve the respondent dock workers from the duty of exercising reasonable care two and one-half days later under greatly changed conditions and with direct knowledge of impending danger. In fact, as indicated heretofore, the evidence reflects that the dock workers had affixed their mooring lines before receiving word from Torman that the dam at Coon Rapids would be open to let the ice and water come through and that they did nothing further to safeguard the barge from that impending danger. Such inaction cannot be considered as being consistent with due care under the circumstances.

Since the respondent was negligent in failing to secure the libelant's barge properly after the notice of impending danger, it is unnecessary to discuss libelant's remaining contention that the City negligently failed to retrieve the C.B. 208 after it broke adrift. However, the evidence indicates that the City did attempt to secure the aid of the only boat available for that purpose and failed through no fault of its own.

The above may be considered as the Court's findings of fact, and as conclusions of law the Court finds that the libelant is entitled to an interlocutory decree finding the respondent liable for the damages libelant sustained to its barge and cargo as the direct result of respondent's negligence. An interlocutory decree consistent herewith may be presented upon ten days' notice.

An exception is allowed.