**MEDOMSLEY STEAM SHIPPING COMPANY, Appellant,**

v.

**ELIZABETH RIVER TERMINALS, INC., Appellee.**

No. 9947.

United States Court of Appeals Fourth Circuit.

Argued Nov. 2, 1965.

Decided Jan. 3, 1966.

Walter B. Martin, Jr., Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellant.

Jack E. Greer, Norfolk, Va. (Williams, Cocke, Worrell & Kelly, Norfolk, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, SOBELOFF, Circuit Judge, and MICHIE, District Judge.

HAYNSWORTH, Chief Judge.

In this action for damages, the District Judge found the defendant negligent, but concluded that the defendant's fault was not the proximate cause of the loss. In doing so, we think he misconstrued the testimony.

On September 12, 1960, the Crowborough Beacon broke from her moorings in the Elizabeth River at Norfolk and was carried by the wind and current against a bridge which was damaged. The libelant, Medomsley Steam Shipping Co., called upon the wharfinger to settle the claim of the Commonwealth of Virginia, owner of the bridge. The wharfinger refused, and later the shipowner settled the claim of the Commonwealth. It then brought this action to recover the amount it was required to pay to the Commonwealth.

The Crowborough Beacon was tied up at the defendant's dock, loading a cargo of fertilizer. Upon the receipt of hurricane warnings on the night of September 11, additional lines were put out in all directions, including fore and aft insurance wires. The fore insurance line was a 4¾-inch steel wire cable, which was secured to a cleat on the respondent's dock.

Thereafter, the weather worsened and the winds attained hurricane force during the early morning hours of September 12. The winds diminished as the eye of the storm apparently passed over the area and then shifted to the northwest and grew in intensity, reaching hurricane force again about 0530 on the morning of the 12th. At about 0615, the mooring lines began to part and, with the northwest hurricane force winds, the ship was secured solely by the forward insurance line. Under the strain, the cleat to which it was attached pulled one of its securing bolts partially through the timber, the line slipped off the cleat and the ship was blown away and against the bridge.

There was testimony that the cleat that failed was designed for use on metal and, at one time, had been welded to a metal deck or dock. It was secured to the respondent's wooden dock by two one-inch bolts, running through the deck and an 8″ x 12″ timber. Each of the two bolts was secured on the underside by an O.G. cast iron washer, four inches in diameter and one-inch thick.

A subsequent inspection disclosed that the force of the wind upon the ship, transmitted through the insurance line to the cleat, had caused the farther bolt

and its O.G. washer to be pulled partially through the timber. The timber had split for some eight feet and the washer had been pulled some two or three inches up into it.

There was proof that the original drawings for the dock specified the use of a six-bolt cleat. Such a cleat would have provided three times as much bearing surface as the one in use, and would have derived additional strength from the use of adjacent timbers, which, themselves, would have been tied together. It does not appear why the two-bolt cleat was used and the six-bolt cleat was not, but there was testimony that abundantly justified the District Court's finding that use of the two-bolt cleat was improvident and that the respondent had not used reasonable care to furnish a safe berth or to warn the ship of its deficiency.

Nonetheless, the District Court held that the failure of the cleat was not the proximate cause of the damage. It did so on the basis of testimony quoted in the margin [1] as to what would have hap-

1. Testimony of Alyn F. Fife

"BY MR. MARTIN:

"Q. Now, assuming that the forward insurance wire runs at an angle of approximately forty-five degrees and—let me pick the exact distance—my recollection was, it was roughly sixty feet from the vessel, leading forward—from this area right here, leading forward, and the angle is approximately forty-five degrees—assuming those additional facts, in your opinion, Mr. Fife, would the broad base cleat, with the six bolts in it, have held?

"A. From my previous experience in witnessing what damage has been sustained, I would say that either the insurance wire would have broken or the entire deck of the pier would have come up. It wouldn't have just pulled the bolts through the timber. I think—I couldn't say whether it would hold or not, but I think it would wreck the pier.

" * * *

"BY THE COURT:

"Q. Mr. Fife, the force that was apparently exerted here to pull this bolt and the O.G. washer up through the timber, do I take it that your answer to this last question is that the force that— in other words, if the cleat had held secure, that, in your opinion, the line would probably have parted—the insurance line?

"A. Well, what I would say, Your Honor, if the area that the wind was acting on was great enough to cause failure, either the wire would have parted or the cleat would have pulled the deck of the pier up.

"Q. The whole deck would have come up?

"A. Yes, sir.

"Q. In other words, it wouldn't have parted from the deck of the pier?

"A. It wouldn't have pulled the bolts through the timber.

" * * *

"BY MR. GREER:

" * * *

"Q. All right. And that if there had been the different type cleat used, that is, your broad base cleat, with a strain put on it, that still would not be expected to hold the entire ship, would it?

"A. Well, I have seen them do it.

"Q. I say, that would not be expected, the normal usage, to hold the ship, would it, Mr. Fife?

"A. No, it wouldn't.

"Q. As a matter of fact, what part of this pier would give way, Mr. Fife, if there was an undue strain, assuming it was this cleat or another? What would happen—

"A. It would pull these timbers up, either pick up their joints or break them.

" * * *

"Q. All right. So if you have a large enough strain, you either get a probable tearing up of the pier or breaking of that line?

"A. That's correct.

"Q. It was never meant to hold the entire ship, was it?

"A. No.

"Q. And any one of five cleats, when you have two mooring dolphins, they are not meant to take the full weight of the ship, are they?

"A. Any one—no, I wouldn't say one would be meant to take the full weight."

Testimony of Augustus C. Reed, Jr.

"BY THE COURT:

"Q. * * * From your experience, if the cleat had held steady and the O.G. washer had not gone up through the timber, do you feel that this—do you have an opinion as to whether or not this line, this four and three-quarter-inch wire line, would have parted or would have

pened if the cleat had not failed. The two witnesses who were examined on the subject were of the opinion that the pier, itself, would have failed before the steel insurance line, and the District Judge apparently understood them to say that the force of the wind was such that if this two-bolt cleat had not pulled through, the whole pier would have failed.

We do not think the testimony reasonably susceptible to that construction.

The witness Fife clearly predicated his statement that the pier would be expected to tear up upon his statement, "if the area that the wind was acting on was great enough to cause failure * * *." It is true that he conceded on cross examination that one cleat would not be expected to hold the ship under normal usage, but he also said that he had seen them do it, and his opinion clearly appears that a six-bolt cleat would not have failed as long as the pier was intact.

The witness Reed expressed a similar opinion that the deck would have pulled out, but again it seems clear that he was expressing an opinion as to the point which would first fail if a proper six-bolt cleat had been used. He was responding to a request for his opinion as to whether or not the steel cable would have failed, and his answer is reasonably understood only as saying that the cable would hold under greater strain than the pier. This is made particularly clear when Mr. Reed was asked if the cleat had not failed, would not the insurance line and the pier have withstood the strain. He responded that he had not undertaken to compute it, but that one could compute the force of the wind on the ship and, from that, the strain upon the line and the amount of sheer on the bolts and the timbers of the dock.

It seems plain to us, therefore, that each of the witnesses was saying that, if a proper cleat had been used, there would have been no failure at that point and that, if the stress was sufficiently great, the entire pier would have been pulled down or its timbers ripped up before the insurance line or the cleat would have failed. The record, however, does not establish how much more wind force would have been required to pull the end of the pier out. All that we know is that the force was great enough to cause the deficient cleat to fail and that a proper cleat would not have been the weakest link in the chain. The record contains no basis for a finding of the maximum force the pier, itself could have withstood, but it is clear that it could have withstood more than the cleat. There is no basis for a finding that the pier, itself, would have failed under the actual force which caused the cleat to fail or under any force to which it would

held, or would you want to express an opinion on that?

"A. My personal opinion—and it's just my personal opinion—that it would pull the end of the dock out.

"Q. You think it would pull the end of the dock out before the line would have parted?

"A. I think so, yes. I don't believe those timbers would have held it.

"* * * *

"BY MR. MARTIN:

"Q. Now, assuming that the cleat had been installed as shown on the plan, with three times the bearing surface, isn't it just as possible, Mr. Reed, that the insurance wire would not have broken and that the cleat would not have pulled out and that the pier would not have been pulled apart?

"* * * *

"THE WITNESS: I guess anybody else's guess is probably as good as mine on that. I guess it could be figured mathematically, taking the diameter of the line and what strain it would hold; then you'd have to get into the amount of wind bearing on the ship and then go back into your timber structure and see how much your bolts would hold on that, how much sheer you would have on the various timbers.

"Q. (By Mr. Martin) But certainly—

"A. But I mean, either way, I think it's only honest to say it would be a guess on my part.

"Q. Certainly, I understand that. What I am trying to point out is this: If the other type of cleat had been installed, it would have certainly held under more pressure than this particular cleat; isn't that true?

"A. That's true."

have been subjected that morning if the cleat had held.

Under these circumstances, we think that the Court, having found that the wharfinger had not exercised reasonable care to provide a safe berth, was required to find also that that want of care was the proximate cause of the ship's being cast adrift.

It is well settled, of course, that a wharfinger is under a duty to exercise reasonable care to furnish a safe berth and to warn a ship of any unexpected hazard or deficiency known to the wharfinger, or which, in the exercise of reasonable care, he should have known.[2] Since the libelant is entitled to judgment on this theory, we have no occasion to consider his contention that he might also be entitled to recovery under the theory of warranty.

The case will be remanded to the District Court for further proceedings.

Reversed and remanded.

2. Smith v. Burnett, 173 U.S. 430, 19 S. Ct. 442, 43 L.Ed. 756; Red Star Barge Line, Inc. v. Lizza Asphalt Construction Co., 2 Cir., 264 F.2d 467; City Compress & Warehouse Co. v. United States, 4 Cir., 190 F.2d 699; Norfolk Tidewater Terminals, Inc. v. Wood Towing Corp., 4 Cir., 94 F.2d 164; M. & J. Tracy, Inc. v. Marks, Lissberger & Son, Inc., 2 Cir., 283 F. 100; Central Barge Co. v. City of Minneapolis, D.C., Wisc., 123 F.Supp. 275.