**SCHWERMAN TRUCKING CO., Plaintiff-Appellant-Cross Appellee,**

v.

**GARTLAND STEAMSHIP COMPANY, Defendant-Appellee-Cross Appellant.**

**Nos. 73–1167, 73–1168.**

United States Court of Appeals, Seventh Circuit.

May 9, 1974.

F.2d 582 (3d Cir. 1970), cert. denied, 401 U.S. 981, 91 S.Ct. 1190, 28 L.Ed.2d 333 (1971).

468

Michael B. Laikin, Harney B. Stover, Jr., Milwaukee, Wis., for Schwerman Trucking.

Paul V. Lucke, Milwaukee, Wis., John A. Sullivan, New York City, for Gartland.

Before SWYGERT, Chief Judge, STEVENS, Circuit Judge, and PERRY,* Senior District Judge.

PERRY, Senior District Judge.

This is an appeal from a judgment of the District Court in favor of the defendant, Gartland Steamship Company (hereinafter called Gartland), in an admiralty action brought by the plaintiff, Schwerman Trucking Company (hereinafter called Schwerman), for damages which occurred to Schwerman's dock during the night of June 25–26, 1969, while Gartland's vessel, the Steamship W. E. FITZGERALD, was moored thereat.

* Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation.

## FINDINGS OF FACT

The District Court made, *inter alia*, certain findings of fact which are summarized below (paragraph numbers comport with the numbers of the Findings):

4. Sometime prior to 1902 the Milwaukee Gas Light Company ("gas company") became the owner of a strip of land along the north side of the Menomonee River at Milwaukee, Wisconsin, extending from North 25th Street easterly about 1900 feet and lying between West St. Paul Avenue and the center of the river. This property was subsequently purchased by Schwerman, as related below.

5. Sometime during the years 1902–1904 the gas company built a dock along the river frontage of its property. The portion of the dock east of buildings located near the center of the property was of heavy-weight construction, and the portion west of the buildings was of lighter-weight construction. The easterly section of the dock was built with multiple sets of tie rods for back support. The westerly section was built with a single set of 1½″ tie rods for back support and two rows of piles at the face of the dock. The entire dock was constructed of wood piling, 3-lap, wood Wakefield sheeting, wood cap and facing, and wood walers (fender timbers).

6. In 1923 the gas company had the entire dock reconstructed by the Edward E. Gillen Co. of Milwaukee. In general, the reconstruction consisted of removing the wood cap and facing, cutting off the tops of the existing piles and Wakefield sheeting to a lower level, driving some additional piles, and placing a concrete cap along the top of the dock. Cast iron bollards were then affixed along the top of the concrete cap at 120-feet intervals.

9. The Edward E. Gillen Co. performed a survey of the dock for the gas company in 1941. A diver examined that portion of the reconstructed dock which lay abreast of the buildings and found the Wakefield sheeting badly deteriorated. A report by the Gillen Co.

noted the existence of seven broken piles and six instances where the Wakefield sheeting either had developed holes or had sprung outward. It is the function of the Wakefield sheeting to form a continuous wall between the dock fill and the river, and to prevent the escape of the fill into the river.

10. No repairs were made following the 1941 survey. The only major repair work done to the dock after its reconstruction in 1923 was some repair work done in 1932 to the easterly section. As far as is known, no repairs were made to any of the dock sections abreast of the buildings or west of them.

14. In 1966 the gas company entered into a contract with Fred Schwerman for the sale of all of its realty between West St. Paul Avenue and the Menomonee River.

16. In December of 1968 the gas company delivered a warranty deed to the riverfront property to Fred Schwerman, and in January of 1969 he quitclaimed all of his interest in that property to the Schwerman Trucking Company.

17. In 1967 Schwerman retained a Milwaukee consulting engineering firm to design and supervise the construction of a new means of access to the dock property, the existing access bridge and ramp containing too sharp a curve and insufficient strength for use by Schwerman's heavy vehicles.

18. Following the taking of soil boring tests in March, 1967, which demonstrated that the soil was very silty and capable of lateral movement under heavy loads, Mr. Robert Schloemer of the engineering firm prepared plans for a new bridge. The weight of this bridge design was projected at 4,127 tons.

19. Mr. Schloemer was then instructed to look into cheaper, alternative means of access. A combination bridge and earthen access ramp structure was then designed, with projected weight of 30,000 tons. In September, 1967, Mr. Schloemer inspected the dock wall west of the buildings from a small water

craft whence he was able to inspect the bottom of the concrete cap and the tops of the piles. His inspection revealed that the bottom of the concrete cap was seriously spalled, and that the tops of the piles underneath the cap were rotted to a considerable degree. Mr. Schloemer then advised against the use of the 30,000-ton earthen ramp design, being fearful that the huge weight would push the badly deteriorated dock wall into the river.

20. Following Mr. Schloemer's inspection of the dock face, Fred Schwerman conducted an excavation in the area of the anchor piling in order to ascertain its condition. A determination was made by Fred Schwerman that the anchor piling was in good condition and, based on this, Mr. Schloemer was directed to devise some means of alleviating the strain of the earthen ramp on the dilapidated dock wall and to proceed with the earthen ramp design.

21. Fred Schwerman did not inspect the tie rods extending from the anchor piling to the dock face at the time of his excavation. Mr. Schloemer personally made some excavations, but he, too, did not inspect the tie rods.

22. To alleviate the strain on the dock wall, Mr. Schloemer designed a wall of steel sheeting to be installed at the foot of the earthen access ramp; however, the sheeting did not extend all the way to the western boundary of the property in question, ending some 65 feet from that boundary. This resulted in the application of pressure by the 30,000-ton access ramp at the base of the piles which supported the concrete cap extending over the last 65 feet of dock frontage.

23. A combination bridge and earthen access ramp was then built in 1967–1968. The area between the first and second rows of anchor piling was excavated and the old tie rods removed. New rods 1½" in diameter extended from the steel sheeting to the second row of anchor piling. Existing tie rods

between the dock face and the first set of back anchor piles were not replaced.

24. After completion of the bridge and ramp, gravel trucks and asphalt tankers weighing between 10 and 14 tons began to traverse the ramp and the land surface between the ramp and the dock wall.

25. In July of 1968 Mr. Schloemer conducted a test which showed that the dock wall had moved almost 2 inches toward the river in the preceding six months. Earlier, in October, 1967, Mr. Schloemer had recommended that periodic tests be made to check the movement of the dock wall into the river; however, except for the test made in July of 1968, no other movement tests were made.

26. Also in July of 1968, Gartland desired to lay up the W. E. FITZGERALD in the Milwaukee area due to a business slowdown. Schwerman was contacted regarding a suitable dock for mooring her and was receptive.

27. Accordingly, Mr. Carl Schwerman, a Vice President of Schwerman, requested Schwerman's resident counsel to draft a mooring contract. Said counsel procured a copy of the form which the gas company had used in the past for winter mooring on its premises, and altered the terms where appropriate. The contract was sent to Gartland's offices and was signed by Mr. Robert Stack, Gartland's Secretary-Treasurer.

28. The contract, as signed by Mr. Stack, was then delivered to Schwerman by Mr. Floyd Brown, Gartland's Marine Superintendent, on the occasion of the latter's arrival in Milwaukee to meet the vessel and check the mooring. Carl Schwerman then executed the contract on behalf of Schwerman on Aug. 5, 1968.

29. The sixth paragraph of the contract provided:

"You [Gartland] will exercise such caution and care as may be necessary to protect our [Schwerman's] dock facilities from damage in the course of

any movement or mooring of the W. E. FITZGERALD, and you will repair any damage to our dock occasioned by your occupancy thereof."

30. The Court found that the sixth paragraph of the contract did not set forth a strict liability standard, as argued by Schwerman. Rather, the Court found that the contract imposed upon Gartland an obligation to use "caution and care" during the entire period its vessel was moored to Schwerman's dock, and further provided for liability by Gartland to repair any damage to the dock proximately caused by a lack of due care on its part.

31. In August, 1968, the ship was moored at the west end of the dock in such position that the forward end of the afterhousing of the ship was in the vicinity of the most westerly of the cluster of buildings on the Schwerman property. The ship was moored to the dock by the ship's crew under the supervision of her Master. The mooring was also checked and found to be satisfactory by Mr. Floyd Brown. After mooring, the ship became a dead ship and had no power of her own. Gartland employed a shipkeeper who visited the ship about every other day to check the lines and take soundings.

32. Prior to the arrival of the vessel at the dock, Floyd Brown checked the dock and found the bollards and the concrete cap to be in what he considered adequate condition. Mr. Howard Yaffe, Gartland's Assistant Marine Superintendent, arrived on the scene during the lay-up of the ship and also checked the dock and the mooring configuration, finding them to be satisfactory. Neither Floyd Brown nor Howard Yaffe was able to inspect the dock below the water line.

33. The vessel was moored with twelve mooring lines, each doubled around a bollard and extending back to the vessel, where it was tied off. The port bow line extended by itself to the most westerly bollard on the dock, providing a lead of approximately 130 feet. The angle of incidence formed by the port bow line and the dock face was approximately 20°.

34. The starboard bow line, the starboard windlass room line, and a line leading from the forward mooring winch were all on the bollard east of the most westerly bollard. Another line from the forward mooring winch led aft to the next bollard along with the midship dead line leading forward. A line leading forward from the after mooring winch led to the next bollard, along with the midship dead line leading aft. A line leading aft from the after mooring winch led to the next bollard, along with a fantail wire leading forward. Two more fantail wires, one port and one starboard, led aft to the final bollard.

35. The starboard anchor was down approximately 50 feet ahead of the vessel, the chain lying slack on the bottom.

36. The U.S. Army Corps of Engineers performed maintenance dredging in the Menomonee River in the fall of 1968. At their request, the ship was, in late October, moved astern about a ship's length to accommodate the dredging. The movement astern was supervised by Gartland's Marine Superintendent and was accomplished by "winching" the ship (using the ship's lines and winches and bollards on the dock), with portable air compressors furnishing power to the winches. After the ship was winched back to her original position, she was moored to the dock in the same manner as she had been moored in August. Both Floyd Brown and Howard Yaffe checked and approved the mooring.

37. After the movements of the ship to facilitate dredging were completed, the ship, her moorings, the dock, and the bollards on the dock were inspected by Mr. Alan Garland, a marine engineer surveyor, for the purpose of insurance for winter lay-up. Mr. Garland submitted a report approving the mooring.

38. The Corps of Engineers performed further dredging in the spring of 1969. Again at their request, the

ship was winched astern about a ship's length. She was moved forward to approximately her original position about a week later. The shifting was accomplished under the supervision of Howard Yaffe, who re-moored the ship in approximately the same manner as that in which she had been moored in August and October of 1968.

39. Soundings taken after the dredging was completed showed that some of the depths in the navigable channel in the vicinity of the westerly end of the dock exceeded the authorized project depth of 21 feet, and even reached a depth of 23.2 feet between the navigable channel and the dock wall itself.

40. On June 25, 1969, a rainstorm with accompanying winds began to pass through the Milwaukee area. The vessel was checked at 5:30 P.M. on that date by its shipkeeper, who found the lines to be in order. The dock was still intact at 9:00 P.M. when certain employees of Schwerman left the premises.

41. Sometime between 9:00 P.M. on June 25, 1969 and 5:30 A.M. on June 26, 1969, a portion of the dock collapsed into the water. All of the damage occurred forward of the vessel. A portion of the 49' 10½" most westerly section of the dock with the lighter-weight concrete cap, and the next two sections of dock with the heavier cap at the westerly end of the Schwerman property went into the river, the sections of concrete cap falling to the bottom of the river and sinking into the silt. The most westerly section of the heavier section which went into the river had affixed to the top of it the most westerly bollard, to which the port bow line of the ship had been tied. This bollard was located 4' 8" from the most westerly edge of this section.

42. Data available from the United States Weather Bureau indicated that the winds during the period from 9:00 P.M. on June 25 to 5:30 A.M. on June 26 were generally from the southeast, at speeds not in excess of 13 knots, or 15 miles per hour. None of the other vessels that were tied up in Milwaukee Harbor during the evening in question reported any damage to hulls, docks, or mooring lines to the City's Harbormaster. Additional data from the United States Weather Bureau demonstrated that during the period from August, 1968, when the vessel was first tied up, until June 25, 1969, the Milwaukee area experienced recorded winds on numerous occasions that were more severe than those that prevailed on the evening in question.

43. On June 26, 1969 Schwerman sent a telegram to Mr. Floyd Brown of Gartland advising him of the dock damage and requesting that Gartland make repairs as quickly as possible. On July 28, 1969, counsel for Gartland rejected any claim of Schwerman against Gartland.

44. Early in July of 1969, two additional 30-foot sections of concrete cap and dock went into the river. Those two sections were adjacent to and easterly of the sections which had previously gone into the river.

45. In December of 1969, Schwerman again requested the Edward E. Gillen Co. to conduct another dive to recover the tie rods which had been associated with the collapsed sections of dock. Four tie rods were recovered, all of which had extended from the piles underneath the concrete caps at the dock face back to the first row of anchor piling. Two of them were corroded all the way through, and a third had been corroded down to a minimum diameter of .630 inches. One of the functions of the tie rods is to withstand the forces which would tend to move the dock face into the river.

46. Schwerman alleged that Gartland was negligent in that the FITZGERALD was improperly moored and the shipkeeper did not live aboard the vessel, and further alleged that such negligence proximately caused the collapse of the dock. The Court disagreed and found that Gartland was not negligent in any respect related to the damage that oc-

curred on the evening of June 25–26, 1969.

47. Schwerman argued that Gartland was negligent in not having dropped the vessel's port anchor and in allowing the anchor chain leading to the starboard anchor to lie slack on the bottom. Gartland maintained that the anchoring technique recommended by Schwerman would not have alleviated the strain on the lines, and that the major purpose of the anchor is to act as a fail-safe device to prevent the vessel from floating downriver in the event the mooring lines part. The Court agreed with Gartland's position and found no negligence with regard to its anchoring technique.

48. Schwerman claimed that there was too much slack in the mooring lines and that this caused the vessel to work in and out at the dock during the rainstorm. Having in mind that it is necessary to have some slack in the lines in order to compensate for fluctuations in the water level of the river, the Court found that the amount of slack in the FITZGERALD's lines was reasonable and that there was no negligence on Gartland's part with respect to the manner in which the lines were placed.

49. With respect to the issue of the shipkeeper, Schwerman maintained that his not living aboard was negligent and in violation of § 8–21(1) of the Ordinances of the City of Milwaukee Relating to Harbor, Rivers, and Bridges. The Court, however, agreed with Gartland's contention that its arrangement of having the shipkeeper visit the vessel approximately every other day was in accord with customary practice on the Great Lakes and was in conformity with § 8–21(1) of the Milwaukee Ordinances, which requires that a shipkeeper live on board or be "in charge" of the vessel. Further, the Court found that, had a shipkeeper been on board, he could not have done anything except call for help.

50. The Court found that the dock was badly deteriorated and defective in many respects. The Court further found that Schwerman was negligent in not having repaired these defects prior to the events of June 25–26, 1969, the existence of which defects it either knew or should have known.

51. The Court found additional negligence on the part of Schwerman in having constructed the 30,000-ton access ramp without an extension of the steel sheeting to the western boundary of the property, and in failing to conduct further tests for movement of the dock wall after the test completed in July of 1968 showed a movement of almost 2 inches during the preceding six months.

52. Schwerman contended that the damage to the dock was caused by the FITZGERALD in that the effect of the wind and current on the vessel produced sufficient force on the port bow line to pull the dock into the river. Gartland offered expert testimony to the effect that the wind and current could not have produced sufficient force to pull in the dock, and argued that the damage was caused by an earth slide that occurred behind the dock face and toppled the structure. Gartland theorized that the earth slide was precipitated by a combination of pressure from the earthen access ramp and a sudden, large loss of fill through the deteriorated Wakefield sheeting, the loss of fill occurring as a result of the scouring action of the river handling a heavy volume of water and the effluent from the adjacent storm sewer. The scouring, said Gartland, occurred at a time when the recent dredging had produced greater-than-usual depths at the face of the dock, thereby exposing portions of the deteriorated Wakefield sheeting previously protected by a slope of silt. There were no witnesses to the actual happening of the damage. "Although it is very arguable", said the court, "that the pressure which came from the 30,000-ton access ramp may have played an important role in precipitating the collapse, on a consideration of all the evidence, the Court is not able to tell with sufficient certainty what caused the damage."

53. The Court, however, did find that the events of June 25–26, 1969 were not

the sort which Gartland should have foreseen as a result of the moderate weather conditions that prevailed that evening. Even assuming that the FITZGERALD did play some role in bringing about the damage, the weather conditions were not so severe as to have reasonably alerted Gartland to some corrective course of action.

## CONCLUSIONS OF LAW

The District Court made the following Conclusions of Law:

"1. Schwerman's complaint sets forth two claims, one sounding in tort and the other in contract. The standards of care with respect to these claims are identical; *i. e.,* Gartland had a duty to refrain from causing damage to Schwerman's dock through a lack of due care. The Court has found no negligence on the part of Gartland regarding the events of June 25–26, 1969.

"2. Additionally, Schwerman may not hold Gartland liable if the damage which occurred was caused by Schwerman's own negligence. As previously noted, Schwerman was negligent in a number of respects which may have played a role in bringing about the collapse of its dock.

"3. In any event, under both its tort and contract claims, Schwerman had the burden of proving by a preponderance of the evidence that the damage which occurred was actually caused by Gartland. This Court cannot tell with sufficient certainty what caused the damage of June 25–26, 1969 and, therefore, concludes that Schwerman has not met its burden of proof in this regard.

"4. Furthermore, Schwerman had the additional burden of demonstrating by a preponderance of the evidence that Gartland proximately caused the damage. In this regard, it was incumbent upon Schwerman to demonstrate that the damage in question was of the general sort that was expectable by Gartland. Inasmuch as this Court has found that the damage was not the sort which Gartland should have expected or foreseen as a result of the moderate weather which prevailed during the evening in question, the Court concludes that Schwerman has failed in its burden on this issue."

## APPELLANT'S ARGUMENTS

### I.

Schwerman asks this Court to set aside certain findings of fact made by the District Court on the grounds that they were clearly erroneous. Schwerman correctly states a part of Rule 52 (a), Federal Rules of Civil Procedure: "Findings of fact shall not be set aside unless clearly erroneous * * *." There is, however, a second clause which reads: "and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Schwerman correctly quotes the determinant set out in McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954):

. . . A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." 348 U.S. at 20.

■■ Schwerman first contends that because the District Court adopted proposed findings of fact as submitted by Gartland's counsel, the District Court's findings of fact should not be given the same weight as findings of fact actually prepared by the court, and that the court's findings "can be ignored by this Court in favor of complete review of the evidence in the case."

As to the first part of Schwerman's contention, we note that this Court held, in Mississippi Valley Barge Line Co. v. Cooper Terminal Co., 217 F.2d 321, 322 (7th Cir., 1955):

We do not think the fact that a busy trial judge having requested counsel for the winning party to prepare findings and conclusions, adopts them, makes the judgment based on them suspect in the appellate court.

To the same effect is Penn-Texas Corp. v. Morse, 242 F.2d 243, 247 (7th Cir., 1957), where this Court was asked to disregard the findings of fact made by the district judge because they were prepared by attorneys for the defense. This Court said:

, . . . The challenged findings are not clearly erroneous. We think the factual basis for the ultimate conclusions arrived at by the district judge is clearly manifested by the record, regardless of who composed the words and phrasing entered below.

To like effect is In Re Woodmar Realty Co., 307 F.2d 591, 593–594 (7th Cir., 1962), where we said:

Judge Tehan did not delegate his responsibility when he directed plaintiffs' attorneys to submit proposed findings and conclusions in accordance with the three opinions . . . By having the prevailing party submit proposed findings of fact and conclusions of law, the judge followed a practical and wise custom in which the prevailing party has "an obligation to a busy court to assist it in performance of its duty" under Rule 52(a). Dearborn Nat. Cas. Co. v. Consumers Petroleum Co., 7 Cir., 164 F.2d 332, 333 (1942).

Other Circuits have held likewise. Schilling v. Schwitzer-Cummins Co., 79 U.S.App.D.C. 20, 142 F.2d 82 (1944); Simons v. Davidson Brick Co., 106 F. 2d 518 (9th Cir., 1939); O/Y Finlayson-Forssa A/B v. Pan Atlantic Steamship Corp., 259 F.2d 11 (5th Cir., 1958), cert. denied, 361 U.S. 882, 80 S.Ct. 153, 4 L.Ed.2d 119 (1959); O'Leary v. Liggett Drug Co., 150 F.2d 656 (6th Cir., 1945), cert. denied, 326 U.S. 773, 66 S. Ct. 232, 90 L.Ed. 467 (1945). And the Supreme Court has approved findings even though taken verbatim from the brief of the prevailing party. United States v. Crescent Amusement Co. et al., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160 (1944).

As for the second part of Schwerman's first contention, we are not disposed to ignore the District Court's findings unless, upon review of the evidence in the case, we are of the opinion that they are clearly erroneous. We have reviewed the evidence in the case and are of the firm opinion that said findings are not clearly erroneous.

## II.

 Schwerman next contends that the District Court's Finding of Fact No. 30,—where the District Court found that the mooring contract did not impose strict liability upon Gartland,—is actually a conclusion of law and as such can be disregarded by this Court. In answer, it need be said only that this Court agrees with the District Court's interpretation of the contract. It is noted that Carl Schwerman, Schwerman's Vice President in charge of real estate and research, executed the mooring contract on behalf of Schwerman and testified, both before and at trial, that in his view the contract did not impose strict liability upon Gartland. Moreover, the contract specified that Gartland was to use "caution and care". If strict liability had been intended, there would have been no reason to refer to "caution and care". It is elementary that all language in a written instrument must be considered. Also, where different interpretations are possible, the preferred interpretation is that which is against the party who prepared the instrument. In the latter connection, it is observed that the contract was drafted by Schwerman's resident counsel. Schwerman's reliance upon Viaux v. John T. Scully Foundation Co., 247 Mass. 296, 142 N.E. 81 (1924) is misplaced, for the case is inapposite.

## III.

 Schwerman strongly argues that the District Court erred in its Finding of Fact No. 42 regarding wind speeds during the night of June 25–26, 1969. Schwerman contends that the court found that data from the U.S. Weather Bureau indicated that the winds during that night were generally from the

southeast, at speeds not in excess of 13 knots, or 15 miles per hour; whereas an official weather report of the City of Milwaukee indicated that at 7:35 P.M. on June 25, 1969, the wind was from the west at 35 miles per hour. In the first place, it should be pointed out that the report of the City of Milwaukee reads: ". . . [T]he velocity readings are taken at Mitchell Field . . .", and that the climatological data of the U.S. Weather Bureau, including wind speeds, also were taken at the same Mitchell Field. Second, the District Court expressly limited its finding to wind conditions occurring *subsequent* to *9:00* P.M. on the evening in question,—after witnesses Bugnacki and Robbers had left the dock, which was still intact at that hour,—whereas the 35 m. p. h. wind speed reflected in the city's report was a reading as of *7:30* P.M. on that evening. Thus there is no *inconsistency*, as is urged.

For the foregoing reasons, we cannot find that the District Court's Finding of Fact No. 42 is clearly erroneous.

## IV.

■ Schwerman next asserts that the District Court was clearly in error in finding that it was not able to tell with sufficient certainty what caused the dock damage. Here *Schwerman* is in effect asking this Court to reject *in toto* the credibility of the testimony of Gartland's expert witnesses. We find no reason to do this, there being no foundation for this attack on these witnesses, whose credentials this Court finds ample to support the credibility of their testimony.

## V.

■ We shall dispose of Schwerman's next contention,—that there is a presumption of negligence on the part of the ship, whose movement at the dock caused dock damage,—by pointing out that there is insufficient evidence in the record to compel a court to conclude that it was the working of the ship on her mooring lines which caused the damage

to the dock. In short, such evidence does not predominate.

## VI.

■ Schwerman urges that Gartland was negligent in not streaming the port anchor, in addition to the starboard anchor, in order to stabilize the bow of the ship and to minimize movement of the ship at the dock. We are of the opinion that the District Court rightfully elected to accept the testimony of Professor Yagle,—an expert on the subject of the effect of wind and currents upon ships' movements,—to the effect that the anchoring technique urged by Schwerman would have had negligible effect on restricting the motion of the ship at the dock. Further, it was uncontroverted that anchors are used in a Great Lakes "winter mooring" primarily to guard against the drifting of the ship downriver in the event that the mooring lines should part. Moreover, even it it were conceded that the streaming of both anchors in the manner urged would have alleviated the strain on the mooring lines, it appears that the location in which Schwerman had required the ship to be placed was such that there was insufficient room for streaming the anchors in the manner recommended by Schwerman.

## VII.

■ Schwerman contends that it was negligence, causally connected with the dock damage, for Gartland (1) not to have instructed the shipkeeper as to the operation of the ship's winches in an emergency situation, (2) not to have required the shipkeeper either to live aboard the ship or to inspect it at least every six hours, and (3) not to have been prepared to call, and not to have called, for help during the night of June 25–26, 1969. At the outset, we must point out that there is not sufficient evidence in the record to compel a conclusion that the dock damage was caused by the working of the ship on her lines at the dock. Next, we observe that Schwerman's own witness, Mr. Harlow

Meno, conceded that a study of a photograph taken of the ship and her mooring lines on the morning that the damage was discovered, indicated that all of the mooring lines had the proper amount of slack necessary to compensate for the rise and fall of the level of the water in the river, and that Mr. Meno further conceded that there would have been even less slack in the lines during the night, when the water level was higher. It is not insignificant that none of the lines parted. Finally, evidence in the record, and the wording of Section 8–21(1) of the ordinances of the City of Milwaukee Relating to Harbor, Rivers and Bridges, furnish ample support for the District Court's finding that Gartland's arrangement of having the shipkeeper visit the ship approximately every other day was in accord with customary practice on the Great Lakes and was in conformity with said Section 8–21(1).

### VIII.

 Schwerman argues that the District Court's findings and conclusion that Schwerman was negligent are clearly erroneous because Schwerman owed Gartland no duty except to refrain from wanton and willful misconduct and to warn of any hidden trap or dangerous defect or condition known to Schwerman, and because Gartland had the same duty to inspect the dock as did Schwerman. We reject this argument for several reasons. First, Schwerman's Complaint sets out two causes of action, the first sounding in contract, the other in tort. In the tort claim Schwerman alleged that the dock damage was caused by the occupancy of the ship "without any fault or *negligence* on the part of the *plaintiff* but wholly and solely by reason of the fault and negligence of the defendants . . ." (Emphasis added). Thus in its second cause of action Schwerman put its own negligence into issue.

 Second, we agree with Gartland that a dock owner is under a duty to maintain its dock in a safe condition, Ford Motor Co. v. Bradley Transportation Co., 74 F.Supp. 460, 466 (E.D.Mich. 1947), aff'd 174 F.2d 192 (6th Cir. 1949), and that the failure of a mooring facility *creates a presumption of negligence in the manner of its construction and maintenance.* Petition of Kinsman Transit Co., 1964 A.M.C. 2716, 2728–2729 (W.D.N.Y.1963), modified and aff'd, 338 F.2d 708 (2d Cir. 1964), cert. denied, Continental Grain Co. v. City of Buffalo, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965); City Compress & Warehouse Co. v. United States, 190 F. 2d 699, 702 (4th Cir. 1951).

 Third, we deem Schwerman's position in respect to Gartland more akin to that of a wharfinger than to that of a licensor or a lessor, and such as to bring Schwerman within the ambit of a wharfinger for the purpose of determining whether or not Schwerman had any duty to maintain a safe mooring facility for Gartland. *See* Berwind-White Coal Mining Co. v. City of ░░ew York, 135 F.2d 443, 445 (2d Ci.░ 1943); The Santa Barbara, 299 F. 147, 151 (4th Cir. 1924). We invite attention to the following passages from a letter dated Nov. 8, 1967 and written by the Milwaukee Port Director to Mr. Carl Schwerman (Trial Exhibit 29):

> Confirming our telephone chat of this afternoon, and a previous discussion with Ald. Robert Jendusa:
>
> We are pleased to learn that your company has acquired the so-called "Gas Company Dock" in the Menomonee River at 25th Street. We are also pleased to learn that you are interested in having this dock used for winter *mooring and possibly for other dock* usages later on. As promised, we send you herewith a copy of Municipal Port Tariff No. 13. The municpal port charges for mooring are shown under Items 301 and 302 * * *

It is well settled that a wharfinger must exercise reasonable care to provide safe facilities for vessels using its docks.

Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc., 354 F.2d 476, 480 (4th Cir. 1966) ; City Compress & Warehouse Co. v. United States, 190 F.2d 699, 701 (4th Cir. 1951) ; Berwind-White Coal Mining Co. v. City of New York, *supra*; Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (1899). Therefore, we are of the opinion that Schwerman did have a duty to exercise reasonable care to provide a safe dock to Gartland, and we cannot, upon a review of all the evidence, say that the District Court's findings as to Schwerman's negligence were clearly erroneous.

## IX.

■ Schwerman ends with a dual contention: (1) that the District Court erred in concluding that Schwerman may not hold Gartland liable if the dock damage was caused by Schwerman's own negligence, and (2) that Schwerman has a right to recover from Gartland if both parties are held to be negligent. Schwerman is thus asking this Court to apply in this case the admiralty rule of divided damages proper in collision cases. This we cannot do, for two reasons. First, the District Court found that Gartland was free from negligence, and we are not constrained to upset that finding. Second, there is not enough evidence in the record for us to hold that the District Court was clearly in error in finding that it was unable to find with sufficient certainty what caused the damage. Thus we cannot say that this was a collision case.○

For all of the foregoing reasons, we cannot hold on the record before us that any one of the challenged findings of the District Court is clearly erroneous. We are satisfied that no adequate ground exists for disturbing the result reached by the District Judge. We have in fact reviewed the evidence in detail and find his findings of fact and conclusions of law were appropriate. Accordingly, the District Court's decision is Affirmed.

SWYGERT, Chief Judge (concurring).

I fully concur in Senior Judge PERRY's thorough and careful opinion. However, I do wish to express a caveat in respect to the adoption by the district judge of the findings proposed by the prevailing party, here the defendant.

In this case the district judge apparently had both parties submit proposed findings of fact before he rendered his decision. This is an acceptable procedure provided that the judge uses these proposed findings only as an aid in the preparation of his own findings of fact. Here, the judge announced his decision and then requested the prevailing party to select those portions of his proposed findings which were consistent with the oral determination. It appears that this second set of proposed findings, after examination by plaintiff's counsel, was signed by the judge without change.

This court, as have others, has expressly condemned the "mechanical adoption" of the prevailing party's proposed findings. F S Services Inc. v. Custom Farm Services, Inc., 471 F.2d 671, 676 (7th Cir. 1972) ; Holbrook v. Institutional Insurance Co. of America, 369 F.2d 236, 242 (7th Cir. 1966) ; Industrial Building Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1339–1340 (9th Cir. 1970) ; Roberts v. Ross, 344 F.2d 747, 751–752 (3d Cir. 1965) ; United States v. Forness, 125 F.2d 928, 942–943 (2d Cir. 1942). See also United States v. El Paso Natural Gas Co., 376 U.S. 651, 656–657, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).

Since we are bound to accept the findings of fact of the district court unless they are "clearly erroneous," it is important that these findings truly represent the objective determination of the trial judge without the partisan slant of the victorious litigant. I believe that a reviewing court can confidently apply the "clearly erroneous" standard only when the written findings of fact are substantially the work product of the district judge himself.